[No. 435.   January 6, 1892.]

WILSON WADDINGHAM ET AL., PLAINTIFFS IN
ERROR, v. FRANCISCO ROBLEDO ET AL.,
DEFENDANTS IN ERROR.

INJUNCTION—MULTIPLICITY OF SUITS—JURISDICTION—EQUITY.—Where a
bill in equity was brought by the rightful owners of certain land to
restrain the defendants, who, under an inchoate grant from the Mex-
ican government, sought to appropriate, irrigate, and improve a part
thereof to complainants' injury, from such appropriation and improve-
ment, such owners, having no adequate remedy at law, without a
multiplicity of suits and payment for such improvements under sec-
tion 2270, Compiled Laws, 1884, the court had jurisdiction to grant
the relief sought as to such portion of said land.

ID.—ADVERSE POSSESSION—REMEDY.—But, in such case, as to that portion of the land which had been in the actual, open, notorious, and adverse possession of the d efendants, who had actually cultivated portions of it, and appropriated a portion of the water of a river running through the land for purposes of irrigation, complainants' remedy was by an action of ejectment at law. Equity will not interfere to restrain the enjoyment of such improvements, but will prevent the appropriation of new lands and the making of new improvements for further irrigation.

ERROR, from a decree in favor of defendants, to the Fourth Judicial District Court, San Miguel County. Decree reversed.

The facts are stated in the opinion of the court.

CATRON, KNAEBEL & CLANCY for plaintiffs in error.

FRANCIS DOWNS for defendants in error.

LEE, J.—On the seventh day of February, 1888, complainants filed in the court below their bill of complaint, which, omitting the formal parts, is as follows: " * * * Your orators, Wilson Waddingham and Julius G. Day, both residents of the county of New Haven and state of Connecticut, Louis Sulzbacher, a resident of the county of San Miguel and territory of New Mexico, and Thomas B. Catron, a resident of the county of Santa Fe and territory aforesaid, bring this their bill of complaint against Francisco Robledo, Francisco Lucero, Antonio Aloncon, Jose Apodaca, Feliz Garcia, all residents of the county of San Miguel and the territory of New Mexico, and also all their agents, employees, confederates, servants, and associates, privy to and participant in the grievances, wrongs, trespasses, and threats hereinafter complained of, their names being to your orators unknown, and they being very numerous, so that it is impracticable to proceed against them at present more specifically in this suit; and also John Dold, and Henry Dold, and Mary Dold,

lately residents of the said county of San Miguel, but who are now absent from the territory of New Mexico, and whose present places of residence are unknown to your orators; and thereupon your orators, complaining, say that heretofore, to wit, in the month of December, in the year eighteen hundred and eighty-seven, at the county of San Miguel, territory of New Mexico, they, together with the said John Dold, and Henry Dold, and Mary Dold owned, possessed, and were well seized of in fee, and they, together with the said John Dold, and Henry Dold, and Mary Dold, do still own and possess and are well seized of in fee, as tenants in common, all and singular, that certain tract or grant of land commonly known and called the 'Antonio Ortiz Grant,' situate in the said county of San Miguel and territory of New Mexico, which was on the twenty-eighth day of June, A. D. 1819, by the governor of the province of New Mexico, granted to one Antonio Ortiz, and which was afterward, to wit, on the third day of March, A. D. 1869, by the congress of the United States, duly confirmed as private land claim number 42 to the said original grantee, his heirs and legal representatives, under which confirmees your orators and the said John Dold, and Henry Dold, and Mary Dold derived their said title, possession, and seizin of, in, and to the said tract or grant of land, and by whom your orators and said John Dold, and Henry Dold, and Mary Dold were duly placed in possession of all and singular the same as owners thereof, long prior to the commission of the grievances and threats hereinafter mentioned, and which tract or grant of land is more particularly bounded and described as follows, to wit." Here follows a description of the Antonio Ortiz grant, and the allegation that it contains one hundred and sixty-three thousand, nine hundred and twenty-one and sixty-eight hundredths acres. "And your orators further show that because of the said absence from the territory of

the said John Dold, and Henry Dold, and Mary Dold, and of the urgency and immediate necessity, as hereinafter set forth, of seeking without delay the relief herein prayed, your orators have had no opportunity to apply to the said John Dold and Henry Dold for their consent to be united herein with your orators as parties complainant, and without such consent your orators have no authority to use the names of the said John Dold, and Henry Dold, and Mary Dold, or either thereof, as parties complainant to this bill; and, therefore, the said John Dold, and Henry Dold, and Mary Dold are made parties defendant to the same. Your orators further show that the said claim, ownership, possession, and seizin of your orators and the said defendants Dold, of, in, and to the said tract or grant of land are subject to the exception that certain small, specific parts of the said tract or grant of land are possessed and claimed by certain persons not parties to this suit, and who have no interest in the matters therein in controversy, and who are not privy to or participant in the grievances, trespasses, and threats hereinafter set forth. And your orators further show that, except as aforesaid, the said Wilson Waddingham and Julius G. Day are seized and possessed of sixty-one undivided sixty-third parts of the said tract or grant of land, and the said Louis Sulzbacher is seized and possessed of one undivided sixty-third part thereof, and the said Thomas B. Catron is seized and possessed of an undivided one hundred and eighty-ninth part thereof, and the said John Dold, and Henry Dold, and Mary Dold are seized and possessed of the remainder thereof. And your orators further show that a copious and valuable stream of water, known as the 'Gallinas River,' runs through the said tract of land in its natural channel and course, and to the extent that it so runs through the said tract or grant of land it is part of the real estate aforesaid of your orators and the said

John Dold, and Henry Dold, and Mary Dold; that the waters of the said stream, as they run in their said natural course or channel through the said tract or grant of land, are necessary and indispensable for the use and enjoyment of your orators' said real estate for the purpose of stock raising and agriculture; that the said tract or grant of land contains a large area of pasture ground sufficient and capable for the sustenance and maintenance of large and valuable herds of cattle and other live stock, and the same also contains many thousands of acres of lands well adapted to agricultural uses, but that your orators' use and enjoyment of their said real estate will be impaired and irreparably prejudiced and injured if the said stream of water shall be diverted, and the waters thereof consumed, and the said agricultural lands appropriated by means of the grievances, trespasses, and threats hereinafter specified. And your orators further show that the said defendants Francisco Robledo, Francisco Lucero, Antonio Aloncon, Jose Apodaca, and Feliz Garcia, and their said unknown agents, employees, servants, confederates, and associates, all conspiring and confederating together in that behalf, on or about the third day of January, A. D. 1888, began to construct, and are still constructing, near Los Torres, and within the limits of the said tract or grant of land, but not upon the said excepted parts, or any portion of the said excepted parts, a dam across the said Gallinas river, for the purpose and with the intent of impounding and holding the waters of the said river, and creating a great pond or reservoir on the said real estate of your orators and the said John Dold, and Henry Dold, and Mary Dold; and also began to construct, and are still constructing, a large ditch or acequia, extending from the said dam upon and across the said grant or tract of land, with the intent to carry the waters which might be collected and held by the said dam upon the said tract or grant of land, and

especially upon and across the said parts thereof, embracing many thousands of acres, aforesaid, which are well adapted to agriculture, and with the further intent to parcel out and divide among themselves many thousands of acres of the said agricultural land, the property, as aforesaid, of your orators and the said John Dold, and Henry Dold, and Mary Dold, and to irrigate the said agricultural land by means of the said ditch or acequia, and with the further intent to introduce upon the said agricultural lands, as well as upon other parts of the said grant or tract of land, numerous strange settlers, having no estate, right, title, interest, claim, or demand whatsoever, in law or in equity, of, in, or to the said tract or grant of land or the parts thereof so sought to be appropriated, and thereupon to cultivate, inhabit, use, and enjoy the said lands and the rents, issues, and profits thereof, to the exclusion and prejudice of your orators. And your orators further show that the said defendants and their confederates so hereby charged have already constructed the said ditch or acequia upon and across the said tract or grant of land for a greater distance than one mile, and they are still pursuing the said work of construction with the several intents aforesaid; and that by means of the said dam and ditch or acequia they are destroying and impairing the very substance of your orators' said estate in the premises, and committing irreparable injury to your orators' said freehold; and the said defendants and their confederates give out and threaten that they will continue to maintain the said dam, and create thereby a great pond or reservoir upon your orators' said real estate, and will continue the further construction of the said ditch or acequia for a much greater distance upon and across your orators' said real estate, and will enter upon, divide up, appropriate, inhabit, cultivate, and use your orators' said agricultural land, and will exclude your orators from their

possession, rights, and interests in the premises, and deprive them of the rents, issues, and profits of their said real estate, and will commit repeated and innumerable trespasses upon the said tract or grant of land and your orators' freehold therein, and will compel your orators to institute numerous suits at law for the recovery of the said lands so threatened to be unlawfully appropriated, unless such appropriation shall be prevented by this honorable court.

"And your orators further show that none of the said defendants, except the said John Dold and Henry Dold and Mary Dold, nor the said confederates, have or has any estate, right, title, interest, claim, or demand, at law or in equity, of, in, or to the said tract or grant of land, or any license, right, or authority whatever to construct or maintain the said dam, or to construct or maintain, use, or enjoy the said ditch or acequia, or to enter upon, possess, claim, inhabit, cultivate, use, or in any manner enjoy or appropriate the said agricultural land, or any part or parcel thereof. And your orators further show that no proceedings have ever been had or authorized for the condemnation or appropriation under the right of eminent domain of the lands and premises, or any part thereof, whereon the said dam has been so constructed, or whereon the said ditch has been in part constructed and is still constructing. And your orators further show that the said dam and the said pond or reservoir made thereby, and the said ditch or acequia, are each and all nuisances especially injurious to your orators, and neither your orators, nor any of them, nor the said John Dold, nor Henry Dold, nor Mary Dold, nor either of them, nor any one else privy to the title to the said tract or grant of land, or having any authority in that behalf, have or has ever consented to or authorized the said acts, misconduct, and threats, or any part thereof, of the said

defendants above complained of. And your orators
further show that the said defendants, except the said
John Dold and Henry Dold and Mary Dold, in pursu-
ance of their said unlawful purpose and intent, have
actually begun to stake out pretended allotments of the
said agricultural land, with a view to the adverse occu-
pancy thereof, and to the establishment of permanent
improvements thereon, by which means, unless this
court shall interfere by its injunction, lawful claims
may be established on the part of such trespassers
against your orators, under which your orators may be
compelled, for the protection of their title in the
premises, to pay for the said improvements against
your orators' consent, and to your orators' manifest
prejudice and disadvantage. And your orators further
show that the said defendants, except the said John
Dold and Henry Dold and Mary Dold, and the said
confederates, are in great part wholly insolvent, and
they are each and all of insufficient pecuniary means to
respond to your orators in damages for the wrongs and
injuries which they are now perpetrating as aforesaid,
and which they threaten hereafter to continue. And
your orators further aver that the said defendants, so
trespassing and erecting and maintaining the said
nuisances, although often requested by your orators to
desist from the same, and to refrain from the continu-
ance and further prosecution thereof, utterly refuse
your orators' said request, and persist in their said
inequitable and injurious misconduct. In considera-
tion whereof, and forasmuch as your orators are
remediless in the premises at common law, and can not
have adequate relief, save by the aid and interposition
of this court in equity, therefore your orators pray that
the said Francisco Robledo, Francisco Lucero, Antonio
Aloncon, Jose Apodaca, and Feliz Garcia, their agents,
employees, confederates, servants, and associates may
be restrained by writ of injunction, issuing out of this

court, under its seal, from proceeding further with the erection of the said dam across the Gallinas river, and from proceeding further with the construction of the said ditch or acequia over and upon the said tract or grant of land and from in any manner using the said dam or ditch or maintaining the same, and from parceling out or dividing among themselves, and from any manner using, the land on the said tract or grant of land which can be irrigated by the said ditch or acequia, and from further trespassing upon the said tract or grant of land, or any part thereof, and also from molesting or interfering with your orators or their attorneys, agents, servants, lessees, tenants, employees, or associates in their use and enjoyment of their said real estate; and that your orators may have such further and other relief in the premises as may be just and equitable, together with their reasonable costs and charges in this behalf." * * *

A preliminary injunction was issued, and, service of process being had on certain of the defendants, on the fifth day of March, A. D. 1888, those defendants entered an appearance in the clerk's office, and filed a demurrer to the bill of complaint. The demurrer is not embraced in the record, and we are not informed as to the objections attempted to be pointed out. However, on the fifteenth day of March, 1888, all of the defendants against whom by name relief was sought by leave of the court withdrew their demurrer, and filed an answer, which, omitting the formal parts, is as follows: "* * * These defendants, * * * answering, say that they deny that they, the said complainants, or any of them, still own, possess, and are well seized in fee as tenants in common of the tract of land mentioned and described in the said bill of complaint; that said defendants had no positive knowledge whether or not said tract of land so mentioned and described was ever granted by the governor of the

province of New Mexico to one Antonio Ortiz on the twenty-eighth day of June, A. D. 1819, or at any other time; that said defendants are informed and believe, and charge the truth to be, that under the laws, and by virtue of the customs and usages, of the government of the republic of Mexico existing and in force at the time of the treaty, commonly known as the 'Treaty of Guadalupe Hidalgo,' between the United States of America and the republic of Mexico, executed on the second day of February, A. D. 1848, that the said grant of land to the said Antonio Ortiz, if any such was ever made, was null and void, and for many years prior to the making of the said treaty the said grant had no validity whatever. Said defendants, further answering, say that on the tenth day of March, A. D. 1846, the departmental assembly of the department of New Mexico, in the name of the republic of Mexico, and under and by virtue of the authority vested in said assembly by the laws of the said government of Mexico, granted a tract of land situate in said county of San Miguel, and on the said Gallinas river, known as 'The Chaperito,' to Jose Garcia, Santiago Martin, Jose Tapia, Jose Manuel Tapia, Prudentio Tapia, Ignacio Aragon, Julian Garcia, Jose Antonio Tapia, Fernando Lucero, Jose Armijo, Juan Madrid, Francisco Salas, Jose Rael, Lugardo Blea, Lorenzo Marques, Rafael Lucero, Jose Nieva Lucero, Desiderio Maese, Miguel Ramon Saies, Tomas Saies, Gabriel Baca, Felipe Madrid, Rafael Marques, Jesus Gonzales, Gabriel Gonzales, Jose Duran, Pablo Olguin, and Jose Baca. That the boundaries of the said tract of land thus granted are as follows, to wit: On the north, the mouth of the canon; on the south, the possession of those of the Puerticito; on the east, the point of the mesa of the Conchas; on the west, the point of the mesa of the Aguilars. That the said grantees were placed in possession of said tract of land thus granted in March, A. D. 1846, and they, their heirs and assigns,

have ever since remained on the same in quiet, peaceable, undisturbed, and adverse possession of the same continuously down to the time of filing of said bill of complaint. That the claim of the settlers and owners of the said Chaperito grant of land has been duly filed in the office of the United States surveyor general of the territory of New Mexico, in accordance with the provisions of the act of congress of 1854, establishing said office, and the rules and instructions issued by the commissioner of the general land office, August 21, 1854, and asking that said tract of land be approved and confirmed to the owners thereof in the name of the original grantees, and that said claim is now pending in the office of the said surveyor general. That the grant of land is situated within the boundaries of the tract of land mentioned and described in said bill of complaint. That all the trespasses and grievances complained of in said bill have been committed, if committed at all, within the boundaries of the said Chaperito grant of land. That said defendants are well seized in fee as tenants in common by inheritance and purchase from the said original grantees, or their legal representatives, of the said Chaperito grant of land. That they, the said defendants, and those through whom they deraign their title have had possession of the said Chaperito grant of land, granted as aforesaid by the government of Mexico, and have held and claimed the same ever since the tenth day of March, A. D. 1846, and are holding and claiming the said tract of land by virtue of said grant and by divers deeds of conveyance, devices, and other assurances purporting to convey an estate in fee-simple as tenants in common to said Chaperito tract of land; and that no claim by a suit at law or equity has been set up or made to said tract of land and effectually prosecuted within two years next preceding the filing of said bill of complaint. Defendants admit that they have constructed and were

constructing a dam across the said Gallinas river, and had begun and were constructing a large ditch or acequia from said dam, with the intent to carry the waters which might be collected and held by said dam across certain parts of the tract of land described and mentioned in said bill of complaint; but said defendants, further answering, say that said dam and said ditch or acequia were constructed and being constructed wholly within the boundaries of the said Chaperito grant of land; that the waters of the said Gallinas river, flowing through the said Chaperito grant of land, have been legally used and enjoyed by said defendants, as tenants in common with the other settlers, owners, and claimants of the said Chaperito grant, ever since the tenth day of March, A. D. 1846, for the purpose of irrigating their cultivated lands on said grant; that for the purpose of irrigating more fully these lands already cultivated, and for the purpose of enlarging the area of cultivable land within the boundaries of the said Chaperito tract of land, said defendants admit that, in common with their cotenants on said Chaperito grant, they constructed and were constructing, as they had a legal right to do, said dam and said acequia, and for no other purpose. Defendants further deny that said complainants have any estate, right, title, interest, claim, or demand whatsoever, in law or equity, of, in, or to the said tract of land upon which said dam is and was being constructed, or the land across which was being constructed said large ditch or acequia; and defendants deny that said complainants have any legal or equitable right to cultivate, inhabit, use, and enjoy said tract of the Chaperito grant where is situated said dam, and across which is constructed or being constructed said ditch or acequia, or to use and enjoy the rents, issues, and profits thereof. Defendants deny that the building and maintaining said dam and said large ditch or acequia will be a nuisance, and they deny that

it will injure, impair, and impartially prejudice the land mentioned and described in said bill of complaint; that, on the contrary, it will greatly benefit said lands, and greatly enhance their value, by increasing the area of both the cultivable lands and the grazing, and largely increase the capability of said lands for the purpose of agriculture and stock raising. Defendants deny that they are in a great part wholly insolvent, and that they, or each and all of them, are of insufficient pecuniary means to respond to said complainants in damages for any wrong or injury which they have done, or may continue to do, as alleged and charged in said bill of complaint." * * *

On the seventeenth of May a motion to dissolve the injunction was filed, and, after argument and on the twenty-eighth of May, the temporary injunction, which had been granted in accordance with the prayer of the bill, was so far modified by the then chief justice "as to permit defendants to construct all acequias nec-. essary for the full irrigation and enjoyment of all lands heretofore actually occupied by defendants, but said defendants are restricted from taking up any new or additional tracts." Issue being joined by the filing of a replication, the case went to a master, to whom were submitted voluminous proofs, and the master found the material facts of the case to be as follows:

"(1) * * * On the twenty-eighth of June, 1819, the governor of New Mexico, then a province of Old Mexico, granted to one Antonio Ortiz a large tract of land on the Gallinas river, in San Miguel county, containing, according to the survey made by the United States government, one hundred and sixty-three thousand, nine hundred and twenty-one and sixty-eight hundredths acres of land. This grant was presented to the surveyor general of New Mexico for approval, and was reported by him to the department of the interior, and thence to congress, as private land claim number

42. It was duly confirmed by act of congress on the third day of March, A. D. 1869, to the heirs and legal representatives of the original grantee, Antonio Ortiz, and was afterward surveyed and patented by the United States government to such heirs and legal representatives on the —— day of ——, 1883. (2) By the mesne conveyances introduced in evidence it appears that all the right and title of the heirs and legal representatives of Antonio Ortiz in and to such grant of land is vested in the complainants in the following shares or proportions: Wilson Waddingham and Julius G. Day, the undivided sixty-one sixty-third part; Louis Sulzbacher, the undivided one sixty-third part; T. B. Catron, the undivided one hundred and eighty-ninth part; and John Dold, Henry Dold, and Mary Dold, defendants, the undivided ramainder of said grant. (3) It also appears that Antonio Ortiz, the original grantee, occupied the land under the grant for a number of years, keeping his cattle and other live stock there, claiming it as his own, and it being generally recognized as his property,—'the sitio of Antonio Ortiz.' Also that some of the assignees of the heirs of Antonio Ortiz, claiming interest in the whole grant, have occupied parts of it almost continuously for the last twenty-five or thirty years, doing a little farming, but principally for stock raising and grazing purposes, having permanent ranches and buildings established on the tract of land. (4) The Gallinas river, a stream of permanent running water, and of considerable size, flows centrally and in a southeasterly direction through the grant, and constitutes its principal water supply. (5) Along this stream there are considerable settlements of the native population, mostly in several small towns and placitas, the largest of which is Chaperito, situate near the center, or a little nearer the northwest corner than the center, of the tract of land. The settlers are mostly engaged in farming the bottom or till-

able lands along the river. The lands thus actually plowed and cultivated north of Los Torres on the grant do not exceed five hundred acres, and those south of Los Torres and on the grant are estimated not to exceed one thousand acres. These settlers have at various times and different places constructed dams on the Gallinas river, and have taken out the necessary acequias to irrigate the cultivated lands, and several such acequias are now in use. (6) Beside the settlement on the grant along the Gallinas river there are other smaller settlements on the Conchas and in the Canon Aguilar. The entire number of men, women, and children residing on the grant is estimated by one witness at fifteen hundred. A number of the families own domestic animals, consisting of cattle, horses, burros, and goats, which graze upon the surrounding pasture lands. The pasture lands have been so used since the settlements were first made. The settlers have also obtained their firewood principally from the surrounding country on the grant, and have used timber from there and from other places not on the grant." The master also found that the defendants were in possession of certain small parcels of land, claiming title by virtue of a grant made subsequent to the grant first mentioned, which grant had not been at the time of the decree in this case acted upon by the political department of the government of the United States.

In the view we take of this case, it is unnecessary to set out at length the master's findings with reference to this grant. He also found, however, the following facts, which are material to a proper understanding of the case. "(11) The original settlers at Chaperito, their descendants, successors, and assigns, and those who have joined them, have occupied the lands set apart to them, cultivated the tillable parts and residing thereon, continuously and uninterruptedly, down to the present time. They have taken out acequias

from the river for the purpose of irrigating the lands and supplying water for domestic use. Some such acequias have been in use almost since the first settlement. It also appears by the evidence that the defendants, as part of and on behalf of such settlers, and as a committee appointed by them, have undertaken a more ambitious project in an agricultural way than any hitherto attempted in that community, and have had surveyed an acequia of large dimensions and considerable length, starting near Los Torres,—a settlement about two and one half miles above Chaperito,—on the river, and running on the south or southwest side of the river in a southeasterly direction a distance of about two and one half miles, to a point about one half mile west of the town of Chaperito. At this latter point the ditch divides into two branches, one branch running southwest a distance of two and one half miles, and the other running southeast a distance of about one mile; making the total length of the ditch and branches five or six miles. It was considerably more than half built at the time the temporary injunction was served in this case. One of the witnesses estimated the expense, in an ordinary way, of constructing the dam and the parts of the ditch already completed, at about six hundred dollars, and that the expense of fully completing it would possibly be a thousand dollars. The ditch, when completed, would be capable of carrying a body of water on an average six feet in width and two and one half feet in depth, and would take a large portion of the water from the river at ordinary stages. It would irrigate a thousand acres of land, possibly much more. The dam at the head of the ditch, for the purpose of turning the water into it from the river, was partly constructed when the injunction was served. It is built of boulders, rock, and brush, and reaches entirely across the river. It would, when completed, retain a large portion of the

water which usually flows down the river. The bottom
lands on either side of the river and immediately adja-
cent thereto, where the dam is constructed, have been
cultivated for many years by the settlers, and there are
old acequias constructed, from which they are irrigated.
(12) The land which the new ditch was designed to
irrigate is situate between the forks or branches west
of Chaperito. It is a kind of basin, with an arroyo
running through the center, which can be irrigated
from the branches on either side. It contains about
eight hundred or a thousand acres. A portion had
been laid off in lots, with appropriate marks to desig-
nate the boundaries of each subdivision, in order to be
parceled out and occupied for agricultural purposes. It
is new land, and has never been broken up or culti-
vated in crops. (13) The ditch has not been com-
pleted near the dam, but the course marked out for it
runs near the river for some distance, until, after pass-
ing the narrows of the river below the dam, it bears off
along the rising ground back from the river, until,
reaching the higher level, it is carried down along the
plains toward the Canon Aguilar, leaving a ridge of
higher ground between it and the river. Little of the
land along the river heretofore cultivated can be irri-
gated from the new ditch, but it was intended by the
projectors to open up to cultivation and irrigation new
land lying between the branches of the ditch. (14)
The ditch, dam, and new land are all within the boun-
daries claimed for both the Antonio Ortiz grant and
the Chaperito grant. The town of Chaperito is cen-
trally located for the Ortiz grant, and is also central for
the Chaperito grant; at least for the eastern and west-
ern boundary calls claimed by the answer. The fol-
lowing are the distances testified to of the points
claimed to bound the Chaperito grant; the point of the
Mesa Aguilar is a little south of west of Chaperito, and
distant eight or nine miles; the point of the Mesa Los

Conchas is on the east, distant about nine miles; the possession of the Puerticito is about three miles south, and the mouth of the canon of the river about twelve miles to the north.'' And from these findings of fact the master reported, as his material conclusions of law, as follows: ''This seems to be a case appropriately within the jurisdiction of an equity court; and the determination now will save expense and trouble to both parties hereafter,—save to the complainants the costs of a multitude of suits, and to the defendants the loss of labor and outlay incident to reducing the land to a state of cultivation. I am of the opinion that the complainants are entitled to the relief prayed for, in so far as it applies to the new land and the new ditch, outside of the old and cultivated land which might be irrigated by the first part of the ditch, if completed; that is, that the defendants should be perpetually enjoined from constructing the new ditch and dam for the purpose of irrigating and cultivating new land hitherto unoccupied and uncultivated under such ditch.''

To the report of the special master both the complainants and the defendants file exceptions, the complainants' exceptions being as follows:    *    *    *

''First.  To the finding of the said master on page five (5) of his report, which is in the following words: 'The original settlers at Chaperito, their descendants, successors, and assigns, and those who have joined them cultivating the tillable parts and residing thereon continuously and uninterruptedly down to the present time,' which finding is contrary to the proofs, as the proofs go entirely to establish the fact that the original settlers at Chaperito, their descendants, successors, and assigns, and those who have joined them, have only occupied and cultivated a portion of the lands. There is no proof that the original settlers, their descendants, successors, and assigns, and those who have joined them, have cultivated the tillable parts of the land and

resided thereon continuously and uninterruptedly down to the present time.

"Second. To the finding of said master on page seven (7) of his report, among the conclusions of law, which is as follows: 'On its face this grant at least is imperfect and inchoate, lacking several of the requisites decided by the courts as necessary to constitute a complete title,'—whereas he should have found that the said grant was void on its face.

"Third. To so much of the report of said master on page eleven (11) of his report as says: 'Such certificates, when the boundaries are definitely defined and reasonable, the master is inclined to hold as color of title,'—whereas said grant being on its face void, and said certificates, being also void, do not and can not give any color of title to pieces of land pretended to be described in them.

"Fourth. To so much of the opinion of the said master on page fourteen (14) of his report as reads: 'Outside of the old and cultivated lands which might be irrigated by the first part of the ditch, if completed; that is, that the defendants should be perpetually enjoined from constructing the new ditch and dam for the purpose of irrigating and cultivating new land hitherto unoccupied and uncultivated under such ditch,'—because it seems to reserve from the injunction the right to build any new ditch or dam on our land. If the present occupiers have acquired any right to the old cultivated lands and certain defined quantities of water which they have already appropriated, they have no right to appropriate to their own use any more of our water than they have already acquired a prescriptive right to use, or to construct any new ditch on our land for the purpose of carrying said water, or to erect any new dam across the river, to turn said water into any new acequia."

The defendants' exceptions, which appear to be unnecessarily voluminous, are as follows:  *  *  *

"First exception: Respondents except to the 'third finding of facts' in said report, because it is not sustained by any evidence legally admissible in this cause.

"Second exception: Respondents except to the 'fifth finding of facts' in said report for the same reasons given in exception first, and for the further reasons that the statement that not exceeding one thousand acres was under cultivation below the town of Los Torres is based solely upon a statement made by the witness Jones, who admitted that he had not surveyed that part of the grant; that he had not passed over all that portion of the grant, or even seen all of it. His testimony on that point was irrelevant, was not based on actual knowledge of said witness, and should not be considered in this cause. That said 'fifth finding of facts' is erroneous and misleading for the reason that the testimony on the part of respondents shows conclusively that the waters of the said Gallinas river had been for more than ten years next preceding the commencement of this suit used exclusively, uninterruptedly, peaceably, and adversely to said complainants by said respondents and their coclaimants; and the further fact that the said complainants failed to produce any evidence that, from the point where the said river enters said Antonio Ortiz grant to the point below where the settlers on the Chaperito grant claim as their southern boundary, they, the said complainants, had ever used a single drop of water from the said Gallinas, from the inception of their supposed grant down to the time of the taking the testimony in this cause.

"Third exception: Respondents except to the 'eighth finding of facts' for the reason that, contrary to the provisions of rule 78 of rules of district court

(equity), said special master has copied into his said report a purported final decree of the 'departmental asamblea' as to the Chaperito grant, but said special master failed and omitted to embody into his report the petition of the settlers of the Chaperito, upon which action was taken by the departmental asamblea, all of which should have been inserted in said report, or else the whole omitted therefrom.

"Fourth exception:   The said report is erroneous, and tends to mislead as to the true facts, especially in the 'ninth finding of facts.'   In this the number of varas is given as held by different settlers upon said Chaperito grant, as evidenced by the 'certificates' of possession that were introduced in evidence by witnesses on the part of respondents; but there are omitted from said report the facts proven, that, at the point where the dam complained of was built, the land on both sides of the river had been in the possession of coclaimants with respondents, and held adversely to complainants for more than ten years next preceding the filing of said bill of complaint; and the further fact that some sixty families, whose names are given in said testimony, reside on the west side of the river Gallinas at and below the town of Los Torres, where said dam had been built, and within the boundaries of said Chaperito grant, all of whom cultivated lands of which they had held quiet, peaceable possession adversely to said complainants for more than ten years next preceding the filing of this bill of complaint in this cause, which lands are, and have for many years been, irrigated from the said Gallinas river; and that the ditch or acequia complained of passes for some two or three miles from said dam over and across the lands of said residents, who are claiming under the said Chaperito grant, and adversely to said complainants.

"Fifth exception:   Respondents except to the said report, and especially to the 'tenth finding of

facts,' because it fails and omits to state that all the original papers under and by virtue of which claim was made by respondents and their coclaimants to the said Chaperito grant of land had been, in the year 1853, duly filed and recorded in the office of the clerk of the probate court and ex officio recorder of San Miguel county, where said tract of land is situated. Said report omits to state the date of the United States patent, under which claimants in their testimony now claim title, and it further fails and omits to state that the said United States patent had not been filed or recorded in the office of the recorder of San Miguel county until after it had been introduced in evidence in this cause; that no reference was made in complainants' bill of complaint that they had or relied upon any United States patent, but in said bill of complaint they distinctly and positively alleged as the basis of their title the purported original grant given by the governor of New Mexico to one Antonio Ortiz, and the act of confirmation by the congress of the United States of America on the third day of March, A. D. 1869; and that neither the original papers of said Ortiz grant, or any copies thereof, were filed with the said bill of complaint, nor any sufficient reason given for not doing so, as they are required by the provisions of section 1921 of the Compiled Laws of New Mexico (1884). Said report further omits to state that the description of the boundaries of the original grant to Antonio Ortiz grant, as first recited in said United States patent, is at utter variance and inconsistent with the boundaries as set forth and alleged in said bill of complaint, and as shown by the undisputed testimony of the witnesses on the part of respondents; that the western boundary of said Antonio Ortiz grant lies to the east of a line drawn north and south through said town of Chaperito; and that the boundaries of said original Antonio Ortiz

grant did not and does not include any of the land in dispute in this cause.

"Sixth exception: That the 'thirteenth finding of facts' is erroneous, and tends to mislead, for the reason that it fails to clearly state that the acequia complained of passes over and across cultivated lands (in the possession of those claiming under the Chaperito grant, and holding adversely to complainants) to a point opposite the said town of Chaperito; that at that point the river makes a very large bend to the east, then following again in a southwesterly direction; that across this bend there intervenes a hill, which terminates at the bend of the river below, where are situated the lands of some of the settlers claiming under the Chaperito grant, and whose certificates of possession are mentioned in said report, whose lands, as set forth in said report, are bounded on the east by the river, and la loma, or hill, on the west, which description would extend these lands westward across and beyond the lands in dispute in this cause, and whose western boundary would be a matter of fact to be ascertained and determined by a trial by jury, to wit, the lands of Gabriel Gallegos, Jesus Gonzales, and Jose Miguel Apodaca, to whose lands at the extreme southern point of said acequia the waters could and would be conducted from said Gallinas river, from which stream said last named parties, coclaimants with respondents, have used the water for irrigating said lands ever since the twenty-sixth day of March, A. D. 1846."

Exceptions to conclusions of law made in said report of special master:

"One. The said special master, in his said report, misconstrues the legal effect of the pleadings in this cause. The bill of complaint does not allege title under a United States patent, but alleges title under the purported original grant to Antonio Ortiz, and the

act of confirmation by congress in 1869; but said complainants failed to file said original grant, or copies thereof, or to give a sufficient reason for failure to do so, as they are required to do by the provisions of section 1921, Compiled Laws of New Mexico (1884). That the defense of said respondents, as set forth in their answer filed in this cause, are the two statutes of limitation of this territory. (See sections 1880 and 1881 of Comp. Laws.) That under the allegations of said bill of complaint the right of action accrued to said complainants, or their assignors, against all the settlers of said Chaperito grant, or those claiming title thereunder, on the third day of March, A. D. 1869,—a period of nineteen years or more ago,—waiving the question of their right to have ejected them, at that time, or at any period after their first settlement in the year 1846. It is shown by the testimony that for more than ten years after the survey and issuance of the United States patent introduced in evidence, but not mentioned in said bill of complaint, said respondents and their coclaimants resided upon and remained in quiet, peaceable possession of said Chaperito grant of land, and claiming adversely to said complainants.

"Two. In said conclusions of law it does not appear that complainants have in any manner sustained the allegations of their bill of complaint. It was shown that the complainants were not entitled to the possession of the land where the said dam has been built; nor that they were entitled to the use of the waters of said Gallinas river below said dam. That no nuisance has been proven, nor any injury to the land; and all there is left of said bill of complaint, as shown by the recommendations of said report, is a threatened trespass by cultivation and improvement of a tract of land of uncertain boundaries, the possession and title of which are disputed between complainants and respondents and their coclaimants. Said recommen-

dations would substitute an injunction for an action of ejectment or trespass. It would take from respondents their constitutional right of a trial by jury. That by the language and terms of said conclusions of law, and the recommendation therein the order of injunction would be vague, uncertain, and consequently void. That, if any trespass is committed, as alleged in said bill is threatened as about to be committed, the said complainants have a plain, adequate, and complete remedy at law."

On September 22, 1890, the district court entered the following decree: "* * * It is ordered that each and all of the exceptions taken to said report in behalf of said respondents be, and the same are, all and several, sustained; that each and all the exceptions thereto taken by the complainants are all and several overruled; and, the court being of opinion that said complainants have a full and adequate remedy at law for the redress of the grievances alleged in their bill of complaint herein, it is further ordered that said bill of complaint be dismissed, with costs to respondents."

From this decree the complainants have appealed to this court, and have assigned seventeen specific grounds of error, the first of which is that the court erred in dismissing the bill of complaint; and it seems that the other sixteen assignments are mere elaborations of reasons in support of this assignment. It is proper to say, in limine, that there is no substantial conflict in the material facts in the case, and, if there were, the findings of the special master as to the facts of the case could not be disturbed in this court, there being in the record abundant evidence to support those findings. Two questions, however, are presented for the consideration of this court, which have received our most careful attention: The first question is, should the bill have been dismissed for the reason that the complainants

*INJUNCTION: multiplicity of suits: jurisdiction: equity.*

below had an adequate remedy at law. The second question is, should the court below, if the first question be answered in the negative, have granted to the complainants any relief upon the case as presented by the pleadings and proofs in this record. The complainants alleged in their bill five grounds, which, if supported by proper evidence, entitled them to relief in a court of equity. These grounds were: (1)   Title and possession in themselves to the Antonio Ortiz grant, or so much of it as is the subject of controversy here; (2)   that the Gallinas river was a natural water course, flowing through the grant, essential to its enjoyment, and that the defendants were diverting the water thereof without right;   (3)   that the defendants were constructing a dam in the said river, which was a private nuisance to the complainants;   (4)   that the defendants were insolvent, and were trespassing upon their title and possession; and   (5)   that the acts of the defendants and their associates, unless prevented, would necessitate a multiplicity of suits. Where the right of the complainant is clear, and he is in possession of the land in controversy, equity will, in a proper case, protect that possession by injunction; and where the complainants' right to the use and enjoyment of water is obstructed, he may have an injunction without showing irreparable injury.   Mott. v. Ewing, 27 Pac. Rep. 194; Conkling v. Improvement Co., 87 Cal. 296; 1 High, Inj., sec. 795, note 6, and cases cited; Carlisle v. Cooper, 21 N. J. Eq. 576; Weiss v. Oregon Iron & Steel Co., 11 Pac. (Ore.) 255. Courts of equity have concurrent jurisdiction with courts of law in a case of private nuisance by diverting or obstructing an ancient water course, and may issue an injunction to prevent the interruption, though the complainant has not established his title at law. Shields v. Arndt, 4 N. J. Eq. 234; 1 High, Inj., sec. 14; Wood, L. Nuis., sec. 785, note 2; Carlisle v.

Cooper, 21 N. J. Eq. 576; Pillsbury v. Moore, 44 Me. 154; Parke v. Kilham, 8 Cal. 78; Holsman v. Boiling Spring Bleaching Co., 14 N. J. Eq. 335; Ang. Water Courses, sec. 444, and cases cited. Insolvency of the defendants, who are threatening to commit repeated trespasses, has always been recognized as a sufficient reason for the interposition of equity by injunction (1 High, Inj., sec. 717, and cases cited; Id., sec. 727, and cases cited; 10 Am. & Eng. Encyclopedia of Law, 835, note 2; Id. 881, note 1); as is the prevention of a multiplicity of suits (1 High, Inj., sec. 717; 10 Am. & Eng. Encyclopedia of Law, 825).

It is unnecessary to decide, and we do not intend to be understood as deciding, that the evidence in this case clearly establishes the existence of all these grounds of equity; but, as will hereafter be shown, it is certainly conclusively established that the complainants are the owners of the tract of land known as the "Antonio Ortiz Grant," unless the defendants have acquired title to some portion of it by adverse possession. They have a confirmation of congress and the patent of the government. As against them, the defendants, so far as they rely upon an inchoate grant from Mexico, can have no standing in this court. Beard v. Federy, 3 Wall. 478; U. S. v. Stone, 2 Wall. 525; Ryan v. Carter, 93 U. S. 78; Tameling v. U. S. Emigration Co., Id. 644; Maxwell Land Grant Case, 121 U. S. 325; Id., 122 U. S. 365; 7 Sup. Ct. Rep. 1271; Chaves v. Whitney, 4 N. M. (Gil.) 611; Grant v. Jaramillo, 6 N. M. 313. It is also conclusively established that the Gallinas river is a natural water course running through the grant, essential to its enjoyment, and that the defendants at the time of the filing of the bill were diverting and attempting to divert the waters thereof, without, so far as the extension of their possession to the new lands and the water to irrigate them is concerned, any other

right than such as is derived under and by virtue of an inchoate and imperfect grant from Mexico. The fact that a new dam was being constructed is admitted, but the insolvency of the defendants is earnestly disputed. The proposition that a multiplicity of suits would result from the wrongful act of the defendants is obvious.

It is contended by the defendants that their constructive possession was coextensive with their so-called "Chaperito Grant." It is contended by the complainants that they were in the actual possession of the lands in controversy, and that, even if this were not so, their constructive possession is coextensive with the boundaries of the Antonio Ortiz grant. We may say here that we do not consider the effort of the defendants to dispute the boundaries of the Antonio Ortiz grant as worthy of notice. We think the evidence clearly established the boundaries of the grant, for the purposes of this case, at least to be substantially as alleged in the bill of complaint. The evidence does not satisfactorily establish the description of the various tracts of land of which the defendants and their associates were in possession at and prior to the institution of this suit; and in using the phrase, "the lands in controversy here," we should be understood as limiting this phrase to the "new lands," about which the witnesses have testified. While the insolvency of the defendants may not be established by an overwhelming preponderance of evidence, it does appear by satisfactory evidence, and, indeed, it is not denied, that it was the purpose of the defendants and their associates to establish a settlement of a great number of persons within the limits of this grant, and to parcel out to them specific portions of it; and it does not appear, nor can we believe, that it was the purpose of the defendants to require that the persons to whom such lands should be apportioned should be solvent and able to respond in damages to the complainants. When, in addition to this, we remember

that the statute of this territory attempts to give to
each one of these persons a lien upon the lands of the
complainants for any improvements erected by them
under a title claimed to be derived from Mexico (Comp.
Laws, 1884, sec. 2270), it is not difficult to determine
that a court of equity ought to have jurisdiction to pre-
vent by injunction such a wrong.  The remedy at law
by ejectment would be wholly inadequate, because, by
the terms of the statute cited, the complainants might
be compelled to pay large sums of money for improve-
ments which would be wholly valueless to them.  The
objection of an adequate remedy at law, while unten-
able, came too late in this case, even though, if made
at an earlier stage of the proceeding, it might have
been entitled to some consideration.  We do not wish
to be understood as saying that, if presented at an ear-
lier stage of the proceeding, it would or could have
been sustained; on the contrary, we think the com-
plainants had no adequate remedy at law; but, if they
had, it was the duty of the defendants to have raised
the question before answering.  "Ordinarily, where it is
competent for the court to grant the relief sought, and
it has jurisdiction of the subject-matter, the objection
of the adequacy of the remedy at law should be taken
at the earliest opportunity, and before the defendant
enters upon a full defense."  Reynes v. Dumont, 130
U. S. 354; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup.
Ct. Rep. 594; Brown v. Lake Superior Iron Co., 134 U.
S. 530.  We think, indeed, that this bill might have
been sustained upon the single equitable ground of the
prevention of a multiplicity of suits, as a bill of peace.
Properly understood, a bill of peace, as is said by Pro-
fessor Pomeroy, is merely a part of the general jurisdic-
tion of equity to prevent multiplicity of actions. 1 Pom.
Eq. Jur., secs. 243, 275.  In the note to Woodward v.
Seeley, 50 Am. Dec. 449, it is said:  "Bills of peace
are of two kinds.  To the first class belong those bills

brought to establish one general right between a single party on one side and a great number of persons on the other, where such right could not be determined by several suits between the different parties. To the second class belong bills brought between two parties to prevent further litigation of a right after it has been satisfactorily established by one or more trials at law. * * * Bills of the first class require that a community of interest in the subject-matter of the controversy, or a common title from which all the separate claims which are at issue arise, should exist among the individuals composing the numerous body on the one side, or between each of them and their single adversary, in order to the exercise of the equity jurisdiction, where the bill is a strict, technical bill of peace.'' And among the illustrations cited are the following: ''It is said that upon this principle bills have been maintained upon the part of the lord of the manor against his tenants to establish a right of free warren; or the right to inclose a part of a common; or by tenants or copyholders, or one of them suing for all, against the lord of the manor, to have a right of common established; or by the tenants against the lord of the manor to establish the right to the profits of a fair held for time out of mind in the manor; or by copyholders against their lord to be relieved of a certain general fine.''

It is urged on behalf of defendants that courts of equity will never restrain a trespasser simply because he is a trespasser; nor at all, unless irreparable injury is shown. We think that this rule is subject to the qualification which we have endeavored to ADVERSE posses- point out here, and that a court of equity sion: remedy. has jurisdiction to grant the relief sought by this bill, or at least so much of the relief as will be hereinafter indicated. Having determined that it was error to dismiss the bill on the ground that complainants have an adequate remedy at law, it remains for us to decide

what relief should have been granted to the complainants by the court below. We are urged by counsel for complainants to remand the case with directions to the court below to grant the injunction as prayed for in the bill of complaint. This, we think, can not be done. While we think it clear that the court had jurisdiction of the cause, and should have rendered a decree in favor of the complainants, we by no means think that the complainants are entitled to all the relief claimed. It appears from the evidence in the record that at the time of the filing of the bill of complaint in this cause the defendants and their associates were in actual, open, notorious, and adverse possession of certain parts of the Antonio Ortiz grant; that they were actually cultivating portions of the lands, and had appropriated a portion of the water of Gallinas river for purposes of irrigation. We think, as to that portion of the grant, the remedy of the complainants at law by an action of ejectment is plain, speedy, and adequate, and that it is not the province of a court of equity, by a decree in a proceeding such as this, to attempt to disturb that possession. If the evidence satisfactorily showed what portions of the grant were thus possessed by the defendants and their associates, and what amount of water they had, prior to the institution of this suit, actually appropriated, it might be possible for this court to render a decree which would preserve the rights of all the parties; for, while it is clear that we would not enjoin the defendants and their associates from maintaining that possession and continuing to appropriate the water to the same extent to which they had previously appropriated it, it is equally clear that it is our duty to restrain them from carrying out what the master characterizes in his findings as "their more ambitious project in an agricultural way than any heretofore attempted in that community," from taking up new lands and appropriating additional water to irri-

gate them, at least until such time as they have challenged in a proper forum the title of the complainants under this patent, and have obtained a decision adverse to that title. We think the evidence shows that at the time of the filing of the bill of complaint the complainants had possession of these new lands; that the complainants had constructive possession of all of the land within the limits of this grant, save only such as was in the actual possession (possessio pedis) of the defendants and their associates; that the possession of the complainants was such as would have enabled the defendants and their associates to maintain ejectment if they had the better title, or, at all events, that the possession was in such condition that the complainants, being the owners, could obtain no adequate remedy in a court of law. The distinction which we seek to point out here is well and clearly drawn by the supreme court of the United States in the case of Holland v. Challen, 110 U. S. 15. We think the acts complained of, done by the defendants prior to the filing of the bill in this case, did not vest the defendants with possession. They were clearly intending to take possession of the new lands and parcel them out. In an action of ejectment by the complainants it would have been difficult, if not impossible, for them to prove that any particular person was in the possession of any particular portion of these new lands, and we think it was competent for them to appeal to a court of equity to restrain the defendants and their associates from taking forcible possession and parceling out these new lands, which, according to the proof, had never been cultivated prior to this time; and that they were not compelled to wait until the allotments had been made, and then bring ejectment against the several allottees. But it must be remembered that it is of the very essence of equity that a restraining order should be definite and certain in its terms; that it should point out to the defendants with

reasonable certainty the specific acts which they are required to refrain from doing; and we are, therefore, powerless in the present state of this record to remand this cause, with directions to restrain the defendants with such particularity and specification as equity and justice require.

Our conclusion, therefore, is that this case should be reversed and remanded to the court below, with instructions to that court to refer the cause to a master to take proof and report to the court what portions of the lands within the exterior boundaries of the Antonio Ortiz grant were in the actual possession of the defendants and their associates, and were actually possessed, cultivated, and occupied by them prior to the seventh day of February, 1888, and what proportion of the waters of the Gallinas river had been appropriated by the defendants and their associates for the purpose of irrigating the said lands and for their domestic purposes; that the defendants and their associates, upon the incoming of such report, should be enjoined and restrained from taking up any more land or appropriating any more water for the purposes of irrigating until such time as they had in a proper proceeding attacked and overcome the complainants' title; and that they be enjoined and restrained from constructing new dams and new ditches for the purpose of irrigating the land so possessed by them prior to the seventh day of February, 1888, but that they be not restrained from maintaining old dams and old ditches for that purpose.

FREEMAN, McFIE, and SEEDS, JJ., concur.

O'BRIEN, C. J., having heard the case below, took no part in this decision.