**BANK OF CALIFORNIA, N. A., v. INTER-NATIONAL MERCANTILE MARINE CO.**
(two cases).

District Court, S. D. New York.
Nov. 29, 1929.

Breed, Abbott & Morgan, of New York City (Hugh S. Williamson and Edward A. Craighill, Jr., both of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (John H. Galey, of New York City, of counsel), for respondents.

KNOX, District Judge.

In this suit, libelant's effort is directed towards the imposition of liability upon respondent for the wrongful delivery of 479 tierces of mild cured salmon which were shipped in 1920 by Columbia Salmon Company to itself at Hamburg, Germany, notify J. Lindenberger, 63 Erich street, Hamburg, Germany. In order that the situation existing between the parties may properly be understood, a rather extended statement of facts is essential.

Prior to the shipment of the goods, Columbia Salmon Company was engaged in canning and pickling salmon on the Pacific Coast of the United States. The president and secretary of the company were Bernard Lindenberger and Robert Lindenberger, respectively. These men were sons of J. Lindenberger, a salmon dealer in Berlin. Another son, Nathan, was a partner of his father in the business in Germany. For a considerable period of time the Columbia Salmon Company had been trading with the foreign partnership, and the latter, at the time with which the court is concerned, was a creditor of the corporation in the sum of $68,000. The shipments in question represented purchases, or intended purchases, by the German firm from the American corporation.

During 1920, salmon could not be imported into Germany unless under license from the Reichsfisch-Versorgung (National Fish Supply Board). In March of that year, Nathan Lindenberger secured a license which would permit the 479 tierces of fish, which made up the shipments, to enter Germany.

The license, by its terms, was good only until May 15, 1920.

On the 29th and 30th days of March, a lot of 404 tierces of the fish were shipped from Astoria, Wash., and a further lot of 52 tierces found its origin in San Francisco. A third lot of 23 tierces had left San Francisco on February 28, 1920, and on reaching Buffalo had been placed in cold storage. The shipments of March 29th and 30th moved from the coast in ordinary box cars, and upon reaching Council Bluffs, Iowa, their eastward progress was delayed for something like seven or ten days by a strike of railway employees. At the solicitation of officials of the shipper, the salmon was transferred to refrigerator cars, it being feared that further exposure to prevailing temperatures might injuriously affect the merchandise. The salmon reached New York too late to be forwarded on a vessel departing on April 24, and it was accordingly stored in a warehouse until May 22d, when it started abroad on the steamship Mongolia. The 23 tierces that had been stored in Buffalo made the sailing of the Manchuria on May 8, 1920, and reached Hamburg on May 20, 1920. There was no refrigeration on either of the vessels, and all of the salmon seems to have been carried in one of the forward holds of the respective steamships. The lot of 456 tierces arrived at Hamburg on June 3d. The next day an agent of respondent issued a delivery order for all the merchandise to J. Lindenberger, in exchange for his undertaking to deposit the bills of lading within fourteen days. In default of so doing, he bound himself to deposit the value of the goods with respondent. To secure this agreement, Lindenberger obligated himself to the extent of 1,000,000 German marks with respect to the lot of 456 tierces, and to the extent of 20,000 such marks as regards the shipment of 23 tierces. As will have been observed, his import license, as originally issued, had expired. In order that there may be no confusion, it may be well to remark that the free port of Hamburg comprises certain docking basins, piers, and warehouses in and about that city, and that the arrival of goods at that port did not enable them to pass the customs borders of the German Empire, in the absence of consent from officials of that government. Lindenberger's license having expired at the time of the arrival of the goods, both he and representatives of the respondent made efforts to procure refrigerated warehouse space within which to store the fish, but, owing, it is said, to the congested conditions of the port, were unable to do so. Meanwhile, the salmon stood exposed to summer temperatures upon respondent's dock at Hamburg. Between the 4th and 14th of June, Lindenberger succeeded in obtaining permission from the German authorities to remove the fish to Berlin, and to store it there in a refrigerator under customs custody and seal. There, also, the public warehouses were full, and, in order to care for the situation, Lindenberger was allowed to place the fish in his own refrigerator. Before being placed in storage, the original tierces were opened, and the fish resorted. A large number of fish were thrown away as refuse. Such of them as were believed to be of merchantable quality were rebrined and refrigerated at a temperature of from 40 to 50 Celsius.

Lindenberger renewed his efforts to gain permission for the importation of the fish, but was unable to accomplish his purpose before February 21, 1921. By this time, the fish, which, according to respondents, had begun to show evidence of deterioration as far back as New York, were in anything but good condition. In fact, since the repacking, hardly more than 321 tierces of the original shipments remained. A large portion of this number was sold in small lots for what it would bring, while the contents of 72 tierces were smoked by Lindenberger and sold to peddlers or to the public from market stalls.

During the time that had intervened, the bills of lading were not delivered to respondent. They first made their appearance abroad in June, 1921, and were then in the hands of representatives of the libelant. At about this time a German court ordered Lindenberger to deposit the value of the goods with respondent's agent. At that time, 1,020,000 German marks, when measured in American money, had a value of $16,000. In June, 1920, they were worth about $23,358. When this suit was brought, the marks were about the equivalent of $5,000 in American money. As a result of what was done by respondent in handling the merchandise, libelant asks damages in the sum of $166,015.

The bills of lading, under which the goods were carried, contained claims as follows:

"15. * * * All claims for short delivery, loss damage, or of whatever nature, must be made in writing to the steamer's agent at the port of destination of the goods within five days after the steamer or lighter finished discharging, and always before the goods are taken delivery of by the consignee; and in case such claims shall not be present-

ed in writing within the time and the place hereinbefore designated, such loss or damage shall be deemed to be waived and the steamer discharged therefrom."

And:

"It is mutually agreed: * * *

"3. Also that the value of each package receipted for as above does not exceed the sum of $100 unless otherwise stated herein, on which basis the rate of freight is adjusted."

Respondent relies on the first of the above-quoted clauses to exonerate it from liability in that libelant failed to comply with the provisions relating to a notice of claim. Failing this, respondent asks that its liability be limited to the valuation placed upon the packages by the original parties to the contract of carriage. Other defenses, however, are interposed, and they are these:

1. That libelant has not shown an interest in the shipment which enables it to maintain the suit.

2. The delivery of the goods to Lindenberger under the circumstances hereinbefore recited cannot be regarded as a conversion in that such disposition was a justifiable act of salvage.

3. That there is no proof that the fish had any value as a marketable commodity at the time and place where the alleged misdelivery took place.

4. That, in the event any liability is found to rest upon respondent, libelant's recovery should be measured in terms of German marks, and as of their value at the date on which suit was begun.

 In my opinion, a carrier's misdelivery of freight to a person who is not entitled to receive the same subjects it to liability to any one who has a right of property in the goods, or who is entitled to the possession thereof. And, if the goods have moved under an order bill of lading, the carrier's liability extends to any one who, for value, and in good faith, purchases such bill, and irrespective of whether the bill was acquired before or after the wrongful delivery of the goods by the carrier.

It is here argued that libelant received the bills of lading covering these shipments, not as a pledge for moneys which were advanced by it, but solely for the purpose of delivering them to the purchaser of the goods against payment of the drafts which accompanied the lading documents.

In passing, it may be said that Columbia Salmon Company became a bankrupt, and its estate has been settled. Libelant was one of the creditors and became such in this fashion: The salmon company was principally engaged in canning salmon in Alaska, but it also occasionally pickled that species of fish at points along the Pacific Coast of California, Oregon, and Washington. The bank financed the business. Under the ordinary practice, it was customary for the officers of the company to acquaint the bank officials with what would be the company's probable pack of salmon for a particular year, and the advances of money to be made by the bank were determined on that basis. Promissory notes evidencing the advances were given the bank. As the fish product was packed in Alaska, it would be shipped to Seattle and placed in warehouses, receipts for such storage being delivered to the bank. As salmon was sold and shipped, bills of lading thereon were delivered to the bank in exchange for warehouse receipts. The bank, upon acceptance of fish by the buyer, would receive the purchase price, and credit such payment against the debit balance of the salmon company. As regards shipments of pickled salmon, the company usually drew drafts on the purchaser which it would discount with the bank. This is what seems to have been done in connection with the shipment of 45 tierces of salmon which is the subject of an opinion, dated November 8, 1929, 40 F.(2d) 78, in a companion case to this, and between the same parties. As respects the present shipments, respondent's testimony is to the effect that the bank, due to tardiness of the intended purchaser of the goods in making payments for previous shipments, was unwilling to advance money on the drafts attached to bills of lading, and received the same merely for the purpose of collecting the same. As a result, the salmon company would receive no credit for drafts, or the goods, until payment thereon was received by the bank. It is further said that the bank so treated the transaction on statements of account that were from time to time furnished the company.

Throughout all of this time, however, the company was indebted to the bank in sums ranging from $353,042.85 to $431,246.09, and libelant, over the same period, was in possession of two hypothecation agreements, dated January 16, 1919, and August 20, 1920, respectively. Each of these agreements contain this provision, signed by the salmon company's appropriate officer:

"We hereby stipulate and agree that all promissory notes, bills of lading, shipping receipts, warehouse or dock receipts * * *

now or hereafter pledged or otherwise deposited with you, or which may come into your possession in any manner, shall be held by you as collateral security for any and all indebtedness now owing or hereafter to be owing to you by us * * * and said securities shall be deemed pledged to you for the payment of such indebtedness from the moment they or any of them shall come into your possession, and shall remain as a continuing security therefor. * * *"

█ Testimony presented on behalf of libelant clearly shows that the bank, had it received payment for the drafts, would have credited the account of the salmon company, and I have no reluctance in holding that the bills of lading and drafts covering the shipments in question were held by the bank as collateral security for the salmon company's outstanding indebtedness.

The facts here disclosed are not sufficient to disclose an intention on the part of the salmon company and the bank to treat this transaction as outside the general lien created by the hypothecation agreements. In this respect, the case differs from Reynes v. Dumont, 130 U. S. 354, 9 S. Ct. 486, 32 L. Ed. 934. Section 51 of the Negotiable Instruments Law (Consol. Laws, c. 38) states that:

"An antecedent or pre-existing debt constitutes value; and is deemed such whether the instrument is payable on demand or at a future time."

. And as was said by Judge Hazel in The Niagara (D. C.) 297 F. 667, 669, affirmed (C. C. A.) 297 F. 670:

"It makes no difference whether the order bill of lading was given as security for an existing loan or owing to the discounting by libelant for value of notes or drafts attached thereto, for under the United States statutes the title became fixed, and in pursuance thereof libelant had the same rights of enforcement as if the transaction had actually been entered into between it and the carrier."

█ For these reasons, respondent's defense that libelant is without authority to maintain the suit is overruled.

██ Nor can respondent escape liability on the ground that its action in delivering the goods to Lindenberger without production of the bills of lading was a justifiable act of salvage. Respondent's first duty was to make diligent inquiry for the person who was rightfully entitled to receive the goods; and

if, after such inquiry, the consignee or indorsee of the bills of lading could not.be found, its obligation was prudently to store the merchandise for and on account of its owner. The carrier has no right under any circumstances to deliver to a stranger. The Thames, 14 Wall. (81 U. S.) 98, 20 L. Ed. 804. Instead of performing its obligation in the premises, respondent hastened to issue a delivery order to J. Lindenberger on the day succeeding the arrival of the greater part of the goods. It knew the character of the merchandise when it accepted the shipments; it also knew, presumably, the conditions prevailing at the port of destination, and the results that might follow if the goods were not quickly handled on arrival. Nevertheless, a delivery order for the merchandise was turned over to one who seems to have given no good excuse for his lack of possession of the bills of lading. There was not the slightest effort to communicate, as it might easily have been done, with the shipper of the merchandise. If respondent had the remotest thought of salvaging a perishing commodity, its action in that behalf is more than passing strange. It knew that the goods were not being removed from the dock, and each day they remained there would tend to lessen their value. Nevertheless, respondent did nothing in the way of seeking instructions from the shipper and consignee, and when any wish it may have had to protect the goods was far short of reasonable hope of realization. No effort whatsoever was made to sell the salmon, and it is hard to credit the statement that at the date of arrival it was without any value at the port of destination, even though some of it had begun to spoil. This brings me to a consideration of the condition of the fish when it reached Hamburg. There is nothing in the record from which a fair inference may be drawn that the salmon was not in good condition upon departure from the Pacific Coast. Furthermore, it is common practice to ship properly cured salmon to the eastern seaboard without refrigeration, so long as the temperatures do not average about 50 degrees Fahrenheit. As one of respondent's witnesses states the case, he would "probably" consider that "may be" he had better put salmon under refrigeration after the temperature got up in the neighborhood of 50 or 55 degrees. During the time that the larger portions of these shipments were in transit between Portland, Or., and Omaha, the temperature ranged from 26 to 43 degrees, which was lower than the average to be found in refrigerator cars. The tempera-

tures of such cars range from 45 to 48 degrees. It is fairly safe to say, therefore, that no spoilage of consequence had occurred up to Omaha, or Council Bluffs. During the delay that there ensued, the mean thermometer readings ran from 36 to 54 degrees. As already stated, the fish came eastward from Omaha or Council Bluffs in iced cars, and was under refrigeration during its stay in New York. In the absence of persuasive proof as to the actual condition of the fish when it went aboard the steamers, a finding that it had not greatly deteriorated is required by the foregoing statements. As bearing upon the actual condition of the merchandise, attention should be called to an examination that was made of some of the tierces when they reached this city. Robert Lindenberger opened 5 or 6 of the fish with a needle. He said, "some of them smelt a little sour under the skin—a little bit sour smell." He adds, nevertheless, that "it was marketable for the German market if it would have been about the same way when it got over there as when I examined it." I am prepared to believe that, notwithstanding the prevailing temperature during the transition of the salmon across this continent, the fish were beginning to sour before they left New York, and I base this conclusion on the evidence given by the witness Woodward who said that in his opinion a shipment of salmon, if subjected to a constant temperature of 45 degrees and if kept under cover, would not deteriorate within a period somewhat longer than 30 days. To this he added, "Some salmon are more susceptible to change of temperature than others, and that depends on the fatness of the fish."

These shipments, it appears, were not kept at a constant temperature, but were exposed to varying temperature conditions, most of them above 45 degrees, for a period of about 42 days. Some of the fish came from the Sacramento river, and salmon there caught is ordinarily not so fat and desirable as that which is taken at points further north. Its tendency to deteriorate, unless kept under ideal conditions, was thereby increased; and, if Woodward's estimate of the length of time good salmon might safely be exposed to a constant temperature of 45 degrees is correct, there is substantial basis for belief that some of the fish had begun to sour by the time they reached New York, but that they were still a merchantable commodity. No spoilage, I believe, took place in a local warehouse where the tierces were in storage at a temperature of 25 degrees Fahrenheit. I also think that the chilling which the fish then received was enough to keep a considerably higher temperature from further deteriorating their quality for several days after they were placed aboard the steamer. At the same time, my judgment is that the fish again began to deteriorate in the course of the voyage of 12 days from New York to Hamburg. There is no proof as to what temperature prevailed during the voyages on which the tierces were carried to Hamburg, but I should imagine they were hardly less than 50 degrees. If this be a fair estimate, it is likely that the condition of the fish was not so good on arrival at Hamburg as it was in New York. If the evidence given by respondent's witnesses is to be accepted at its face value, the fish were in a sorry state when they reached the foreign port of destination. Of the 23 tierces on the Manchuria, and as to which little has so far been said, the witness Kube examined 5 or 6 tierces at Hamburg and found the contents to have a very strong smell. He thereupon took out half the contents of 1 tierce, explored the flesh of one salmon with a needle and found the goods "in bad condition and rotten." He also attempted to eat a bit of the fish, but was obliged to spit it out. He opened 40 or 50 casks of the 456 tierce shipment while the Mongolia was discharging, and found the same bad smell. Some of the tierces "were so far advanced in decomposition that the fish was quick mushy." The pickle was thick on some of the tierces, he said, and was smelling, which showed the fish to be bad. While the content of some tierces appeared to be sound, close examination disclosed its bad condition. Kube further testified that the goods could not have been placed in Hamburg at any price. The witness Meyenburg, who saw the fish from the Mongolia within a day or two of arrival, also stated that the salmon was rotten. All of this is very well, but it fails to satisfy me that the shipments were wholly bad. The difficulty with the testimony is that the witnesses are not certain as to when they inspected the goods. It is inferable that they did not do so until about the time the tierces were loaded on a steamer for Berlin—some two weeks after arrival. But, be this as it may, both Kube and Meyenburg were employees of the Lindenbergers, and presumably their knowledge belonged also to their principals. The latter, nevertheless, thought enough of the salmon to be willing to obligate himself to pay 1,020,000 marks against his failure to produce bills of lading which, had he obtained possession of them,

would have required a much greater expenditure. Furthermore, he probably thought that the fish had a value sufficient to enable him to set it off against some of the indebtedness of Columbia Salmon Company.

In my opinion, the salmon at their worst, on June 4, 1920, were worth more than the maximum of Lindenberger's undertaking. That the fish decomposed rapidly while standing on the open docks, and in the course of their transit to Berlin, admits of no doubt, but with such decomposition, I am not concerned. Respondent's liability should be fixed as of the time that it chose to make it possible for Lindenberger to receive the goods had he elected to do so. That was June 4, 1920. From that date on until the day of actual delivery, respondent retained possession of the goods for account of the person to whom it had given a delivery order. Even assuming that respondent might have revoked its delivery order between June 4th and 14th, the fact remains that it did not do so. Neither did it do anything looking to the protection of the shipper and consignee. Under these circumstances, it is idle to contend that respondent's breach of the contract of carriage took place as of June 14th, rather than as of June 4, 1920.

The remaining items of defense were raised in the aforesaid companion suit between the parties, and were overruled in an opinion bearing date of November 8, 1929. For the reasons there stated, they cannot here serve either to defeat or to lessen libelant's recovery.

A decree in accordance with the foregoing views will be passed.